[Cite as *Jones v. Global Annex, L.L.C.*, 2019-Ohio-2083.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| DONALD JONES, | : | |
| Appellant/Cross-Appellee, | : | CASE NO. CA2018-08-016 |
| | | CA2018-09-017 |
| | : | |
| - vs - | : | O P I N I O N |
| | : | 5/28/2019 |
| GLOBAL ANNEX, LLC, | : | |
| Appellee/Cross-Appellant. | : | |

CIVIL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. CVH 20170201

Kiger & Kiger Lawyers, David V. Kiger, 132 S. Main Street, Washington C.H., Ohio 43160, for appellant/cross-appellee

Jess C. Weade, 220 East Market Street, Washington C.H., Ohio 43160, for appellee/cross-appellant

**HENDRICKSON, P.J.**

{¶ 1}  Appellant/cross-appellee, Donald Jones, Jr., appeals from the decision of the Fayette County Court of Common Pleas denying his adverse possession claim following a bench trial in a dispute over real property with appellee/cross-appellant, Global Annex, LLC.[1]

---

1. The record contains references to appellee/cross-appellant as both "Global Annex, LLC" and "Globe Annex, LLC." However, the notices of appeal filed by the parties refer to appellee/cross-appellant as "Global Annex, LLC." For consistency, we will likewise refer to appellee/cross-appellant as Global Annex, LLC.

Global Annex cross-appeals the trial court's denial of its counterclaim for loss of rental income related to the disputed property. For the reasons discussed below, we affirm the trial court's decision.

{¶ 2} This case involves a dispute over an approximately two-acre tract of land located near Miami Trace Road in Greenfield, Ohio (hereafter, "the disputed property"), which Jones claims by right of adverse possession. The disputed property abuts 2.35 acres of land owned by Jones and a large parcel of farmland owned by Global Annex. Jones claims to have obtained ownership of the disputed property through open, continuous, exclusive, adverse, and notorious use of the property since approximately 1989.

{¶ 3} With respect to the history of the disputed property and surrounding land, including the 2.35-acre plot that was eventually deeded to Jones, the record reveals that in July 1988, the entirety of the land was deeded to Carmel Farms, Inc. Subsequently, in June 1989, Carmel Farms had a survey of the property prepared. Thereafter, by deed dated July 21, 1989, Carmel Farms conveyed the majority of the property to Clarence Whiteside. However, excluded from the conveyance to Whiteside was 2.35 acres of land that Jones was residing on as a tenant of Carmel Farms. The practical effect of this conveyance was to separate the farmland and frontage portion of the property from that portion of land upon which Jones rented.

{¶ 4} Jones leased the 2.35-acre portion of the property from Carmel Farms from 1989 until 2001.[2] Then, in January 2001, Jones entered into a land installment contract with Carmel Farms to purchase the 2.35-acre tract. Subsequently, in November 2005, after payments were completed, Carmel Farms conveyed the 2.35-acre tract to Jones.

{¶ 5} Jones claims to have possessed and exclusively used the disputed property

- 2 -

both prior to and subsequent to obtaining ownership in the abutting 2.35 acres. Jones' purported use included planting trees on the disputed property, mowing the disputed property, creating ATV and four-wheeler tracks on the disputed property, erecting deer stands, planting food-plots for deer, and hunting on the disputed property, and, for the past five-to-ten years, parking campers and boats on the disputed property.

{¶ 6} In February 2017, Global Annex acquired title to the property that Carmel Farms had originally sold to Whiteside. Upon acquiring the property, Global Annex contacted Jones concerning the disputed property, informing Jones that he had encroached on its land. Global Annex then entered upon the disputed property and removed trees, an ATV trail pass, and trail cameras. Jones subsequently staked off the disputed property.

{¶ 7} On July 18, 2017, Jones filed suit against Global Annex to quiet title to the disputed property, claiming he acquired title by adverse possession. Global Annex answered Jones' complaint and raised as an affirmative defense that Jones has not met the applicable statute of limitations for adverse possession. Global Annex also filed a counterclaim asserting damages for loss of rental income related to its inability to lease the disputed property in 2017 and 2018 as a result of Jones' actions. The matter proceeded to a bench trial on May 21, 2018.

{¶ 8} At trial, Jones presented satellite images of his 2.35 acres, the disputed property, and the abutting farmland. The satellite images were from 1964, 1970, 1980, 1985, 1988, 1994, 2000, 2004 through 2007, 2009 through 2011, 2013, 2015, and 2017. Jones also introduced the 1989 land survey Global Annex had completed. Jones argued that the satellite images demonstrated that the disputed property had been used the same since at least 1991.

---

2. Before Carmel Farms took ownership of the land in 1989, Jones and his father leased the 2.35 acres of land

{¶ 9} Jones called as a witness Brent Marshall, an attorney who provided a title opinion concerning Jones' 2.35-acre parcel and the parcel's chain of title. Marshall testified about Carmel Farm's 1988 purchase of the land, its subsequent survey and conveyance of the land to Whiteside in 1989, and its conveyance of the 2.35-acre plot to Jones in 2005 following Jones' payment under the terms of the 2001 land contract. While Marshall had tracked the chain of title for Jones' 2.35-acre parcel, he had not tracked the chain of title for the land Carmel Farms had conveyed to Whiteside.

{¶ 10} Jones' father, Donald Jones, Sr. (hereafter, "D.J.S."), testified that he and his son began living on the 2.35-acre parcel as tenants around 1988. Before renting from Carmel Farms, D.J.S. rented the land from Carmel Farm's predecessor. While renting from Carmel Farm's predecessor, D.J.S. used the disputed property by hunting on it, mowing it, and cutting down trees. After Carmel Farms took over ownership of the disputed property, D.J.S. stopped hunting on it. However, D.J.S. otherwise continued to use the property. He stated he parked a camper on the property around 1992 or 1993 and left it there.

{¶ 11} According to D.J.S., Carmel Farms abandoned an auger, an old combine, and other items of farm equipment on the disputed property at or near the time Carmel Farms sold the property to Whiteside. D.J.S. claimed that sometime after 1994, Carmel Farms "c[a]me and got" the combine from the disputed property. D.J.S. indicated that before he moved off the property around 1997, there were times when individuals farming the land abutting the disputed property asked to park equipment on the property overnight and he sometimes denied their requests.

{¶ 12} Jones also testified about his use of the disputed property, although his recollection of events differed somewhat from his father's recollection. Jones stated that for

from Carmel Farms' predecessor in interest.

as long as he could remember, he considered both the 2.35-acre plot and the disputed property as "his property." He has lived on the property since 1987 or 1988 continuously. Although his father moved away from the land around 1997, Jones stayed on the property. Jones rented the land from Carmel Farms on a month-to-month basis before entering into a contract to purchase the land. Jones believed he was purchasing both the 2.35-acres and the disputed property by land contract.

{¶ 13} Jones stated that after the 1989 survey was completed, no one farmed the disputed property. Jones testified he hunted on the disputed property and no one who used the farmland surrounding it "had [an] issue" with his hunting activities. Furthermore, after moving onto the property in 1987 or 1988, Jones used the "entire property," consisting of the 2.35 acres and disputed area when he rode four-wheelers, ATVs and dirt-bikes, planted a food plot for deer, put up a deer stand, and planted trees.

{¶ 14} Jones testified that Carmel Farms left some equipment on the disputed property after selling a portion of the property it owned to Whiteside in 1989. An auger Carmel Farms left on the property was still on the disputed property as of the date of the trial. Carmel Farms also left behind a planter and combine. Contrary to D.J.S.'s testimony, Jones claimed Carmel Farms did not remove the combine from the disputed property. Rather, Jones, believing he had the right to possess the abandoned farm equipment, had the items cut up and removed from the property. Jones also testified that, contrary to D.J.S.'s testimony, the camper parked on the disputed property had only been on the property for the last five or ten years. However, according to Jones, no one had complained about the camper or anything else being stored on the disputed property. Furthermore, prior to Global Annex, no individual owning or renting the farmland abutting the disputed property had approached him about his activities on the disputed property.

{¶ 15} After Global Annex purchased the farmland abutting the disputed property, Michael Dexter, the corporation's statutory agent, emailed Jones about Jones' encroachment on the disputed property. Jones informed Dexter of his belief that he owned the disputed property. Thereafter, Dexter entered upon the disputed property and removed trees, an ATV trail pass, and trail cameras Jones had installed on the property. Jones responded by placing stakes around the disputed property.

{¶ 16} Jones admitted he had not been paying property taxes on the disputed property. However, Jones explained that his property taxes and insurance were rolled into his monthly mortgage payments. Jones denied reading his insurance documents in detail or looking into his property taxes to determine the acreage he was insuring and paying taxes on.

{¶ 17} Jones' neighbor, Daniel Schuler, testified he is a farmer whose land is near Jones' land. Schuler has farmed near Jones' land since 1989. According to Schuler, Jones has been using the disputed property since 1989. However, Schuler had never investigated Jones' property lines and was not present when Jones and Carmel Farms reached an agreement as to how much land Jones was purchasing by land contract.

{¶ 18} Following Schuler's testimony, Jones rested his case. Dexter took the stand to testify about damages Global Annex had suffered as a result of being unable to lease the disputed property. Dexter first testified that Global Annex had paid property taxes on the disputed property since purchasing it in February 2017 and Jones' had not offered to reimburse Global Annex for the tax expenses. Dexter stated that shortly after purchasing the property, Global Annex realized Jones had encroached onto its land by placing a tractor tire and deer stand in the disputed area. Dexter emailed Jones to inform him of the encroachment and of Global Annex's intent to clear and till the land so that it could be used to farm.

{¶ 19} Dexter estimated that there was 10-12 years of growth on the disputed property that prevented it from being farmed. Once the area is cleared out, Global Annex intends to "cash rent" it to the farmer who rents the farmland abutting the disputed property. Dexter testified Global Annex cash rents the land near the disputed property for $250.00 per acre and that as a result of Jones' actions, Global Annex was unable to rent the disputed property in 2017 and 2018.

{¶ 20} Following Dexter's testimony, the trial court took the matter under advisement. The parties filed written closing arguments, and on June 18, 2018, the court rendered a decision in which it found Jones had failed to establish his adverse possession claim by clear and convincing evidence. The court concluded that Jones "did not establish an ownership interest in the property at issue prior to 2001" and "failed to establish the continuous element for twenty-one (21) years [as] required in an adverse possession action." The court further denied Global Annex's counterclaim, stating that the "disputed acreage was not cleared, [and] was not in a condition to be rented out as tillable acreage." Although the court found "there [was] some evidence that the condition of the acreage may be the result of [Jones'] actions," it determined that "there [was] equal evidence to establish that the non-tillable nature of the acreage was the result of the previous owners' actions."

{¶ 21} Jones moved for a new trial, claiming that the court's judgment with respect to his adverse possession claim was against the manifest weight of the evidence. Jones argued the court failed to consider the testimony of his expert witness, Marshall, who had examined title to the land. The trial court denied Jones' motion for new trial on August 10, 2018, concluding that Marshall's testimony related to Jones' ownership in the 2.35-acre tract and did not relate to the disputed property prior to 2001.

{¶ 22} Jones appealed the denial of his adverse possession claim, raising two

assignments of error. Global Annex cross-appealed, raising one assignment of error related to the denial of its counterclaim. As Jones' assignments of error are related, we will address them together.

{¶ 23} Jones' First Assignment of Error:

{¶ 24} THE LOWER COURT'S RULING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS PLAINTIFF CAN TACK HIS ADVERSE POSSESSION CLAIM ONTO THE PREDECESSOR'S IN TITLE BECAUSE THEY WERE IN PRIVITY OF CONTRACT.

{¶ 25} Jones' Second Assignment of Error:

{¶ 26} THE LOWER COURT'S RULING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS PLAINTIFF MR. JONES, AND HIS PREDECESSORS IN TITLE, HAVE ADVERSELY POSSESSED THE DISPUTED PROPERTY AS THEY ALWAYS HAD ACTUAL, HOSTILE, CONTINUOUS, OPEN AND NOTORIOUS, AND EXCLUSIVE POSSESSION OF THE DISPUTED PROPERTY UP TO A CERTAIN LINE.

{¶ 27} In his first and second assignments of error, Jones argues the trial court's denial of his adverse possession claim is against the manifest weight of the evidence. Jones contends that he and Carmel Farms were in privity of contract and that by tacking his adverse use to Carmel Farm's adverse use, he has established the 21-year prescriptive period required for adverse possession.

{¶ 28} "When evaluating whether a judgment is against the manifest weight of the evidence in a civil case, the standard of review is the same as in the criminal context." *Ford v. West*, 12th Dist. Fayette No. CA2017-11-025, 2018-Ohio-2626, ¶ 9. *See also Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 17. Thus, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way

and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Carson v. Duff*, 12th Dist. Fayette Nos. CA2017-03-005 and CA2017-03-007, 2017-Ohio-8199, ¶ 11, citing *Eastley* at ¶ 20. "A judgment will not be reversed as being against the manifest weight of the evidence where the judgment is supported by some competent, credible evidence going to all essential elements of the case." *Id.*

**{¶ 29}** "[T]o succeed in acquiring title by adverse possession, the claimant must show exclusive possession that is open, notorious, continuous, and adverse for 21 years." *Evanich v. Bridge*, 119 Ohio St.3d 260, 2008-Ohio-3820, ¶ 7. *See also Ford* at ¶ 10. "While adverse possession is a recognized common law method of obtaining title to real property, it is not favored." *Hoosier v. Heirs*, 4th Dist. Pike No. 14CA846, 2014-Ohio-5810, ¶ 23, citing *Grace v. Koch*, 81 Ohio St.3d 577, 580 (1998). Rather, "[t]he legal titleholder is entitled to a strong presumption that he is the legal owner of the property." *Ford* at ¶ 10.

**{¶ 30}** The party seeking title by adverse possession bears the burden of proving the elements of adverse possession by clear and convincing evidence. *Bonham v. Hamilton*, 12th Dist. Butler No. CA2006-02-030, 2007-Ohio-349, ¶ 11, citing *Grace* at 579. "[C]lear and convincing evidence is that 'measure of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *State ex rel. Kesterson v. Kent State Univ.*, Slip Opinion No. 2018-Ohio-5110, ¶ 12, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶ 31}** With respect to the 21-year requirement of an adverse possession claim, the Ohio Supreme Court has held that a claimant may "tack" his adverse use to any period of adverse use by prior succeeding owners in privity with one another. *Zipf v. Dalgarn*, 114

Ohio St. 291, 296 (1926), quoting 2 *Corpus Juris*, p. 82 ("if there is privity between successive occupants holding adversely to the true title continuously, the successive periods of occupation may be united or tacked to each other to make up the time of adverse holding prescribed by the statute as against such title"). "'Privity that will permit the tacking of possession exists between * * * landlord and tenant.'" *Zipf* at 296, quoting *Thompson on Real Property*, Vol. 3, Section 2527. *See also Powers v. Malavazos*, 25 Ohio App. 450, 454 (4th Dist.1927) ("Possession of a tenant ordinarily is possession of the landlord").

**{¶ 32}** As for the requirement that the possession be adverse, the supreme court has recognized that "[i]t is the visible and adverse possession with an intent to possess that constitutes [the occupancy's] adverse character." *Humphries v. Huffman*, 33 Ohio St. 395, 402 (1878); *Evanich* at ¶ 8. "The occupancy must be such as to give notice to the real owner of the extent of the adverse claim." *Humphries* at 404.

**{¶ 33}** Turning to the case at hand, Jones contends that his testimony and that of his father demonstrate he was "in privity of contract with the owner of the ground, Carmel Farms, as the owner's tenants." Because he used the disputed property to hunt, plant trees and food plots, to ride four-wheelers and ATVs, and to place personal belongings on while a tenant of Carmel Farms and then after becoming an owner of property upon completion of the land contract, Jones argues he has "preserv[ed] * * * privity of contract" and can tack his possession to that of Carmel Farms to obtain adverse possession of the disputed property. However, the evidence adduced at trial indicated that after the 1989 survey, Carmel Farms conveyed all of the land it owned to Whiteside except for the 2.35 acres it leased to Jones. Carmel Farms was no longer the owner of the disputed property after 1989 and there was no evidence presented at trial that Carmel Farms held itself out as the owner of the disputed property after 1989 or that it adversely possessed the disputed property after its sale to

Whiteside. As such, Carmel Farms had no interest in the disputed property after 1989. Prior to its conveyance to Whiteside, Carmel Farms had a right, as the owner of the property, to occupy the disputed property. Consequently, there was no adverse occupation of the disputed property by Carmel Farms prior to its conveyance to Whiteside to which a claim of privity could attach. The manifest weight of the evidence therefore supported the trial court's finding that Jones failed to establish the continuous element for 21 years as required for an adverse possession action.

{¶ 34} Jones further argues that the satellite images introduced at trial demarcated a clear line between the land that was farmed by Whiteside and his successors in interest and the disputed property. Jones contends these images support his claim that the legal title holders of the disputed property "acquiesced" to new boundary lines that differentiated from those established in the 1989 survey. To support his position, Jones relies on the supreme court's holding that

> [w]here one of two proprietors, respectively, of adjoining lands holds actual, continuous, notorious and exclusive possession up to a certain line, though not originally the true one, for the full period of twenty-one years, the statute of limitations applies in his favor and against the adjoining proprietor, although such possession may have grown out of the mutual mistake of the parties respectively, in respect to the locality of what was originally the true lines between them.

*Yetzer v. Thoman*, 17 Ohio St. 130 (1866), syllabus.

{¶ 35} Beyond the fact that Jones cannot establish adverse possession of the disputed property for the full period of 21 years, Jones is mistaken in his contention that the satellite images clearly and convincingly demonstrate that he had exclusive possession that was hostile, open, notorious, continuous, and adverse. The images presented at trial do not depict the property as it existed in 1996 – 21 years before Jones' complaint to quiet title by means of adverse possession was filed. Rather, the images jump in time from 1994 to 2000.

- 11 -

The satellite images reveal that the tillable acreage on the disputed property changed after 1994, but the ATV and four-wheeler tracks did not begin to appear on the disputed property until 2004 and trees that were planted along the boundary of the disputed area did not appear on the satellite images until 2007. The images, therefore, do not set forth clear and convincing evidence establishing Jones' adverse possession claim.

{¶ 36} Accordingly, for the reasons stated above, we find that the trial court's denial of Jones' adverse possession claim was supported by the manifest weight of the evidence. Jones failed to prove by clear and convincing evidence his adverse possession claim. Jones' first and second assignments of error are, therefore, overruled.

{¶ 37} Global Annex's Cross-Assignment of Error:

{¶ 38} THE TRIAL COURT'S RULING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WITH RESPECT TO THE COUNTERCLAIM AS BASED UPON THE ACTIONS OF APPELLANT, GLOB[AL] [ANNEX] HAS BEEN UNABLE TO LEASE THE ACREAGE FOR AGRICULTURAL PURPOSES IN 2017 AND 2018.

{¶ 39} In its cross-assignment of error, Global Annex argues that the trial court's denial of its counterclaim for loss of farm rental income is against the manifest weight of the evidence. Global Annex contends that Dexter's testimony established damages in the amount of $1,000 for its inability to lease the disputed property as farmland in 2017 and 2018.

{¶ 40} "The determination of damages is within the discretion of the trial court and will be sustained by a reviewing court unless the damage award is against the manifest weight of the evidence." *Nguyen v. Chen*, 12th Dist. Butler No. CA2013-10-191, 2014-Ohio-5188, ¶ 32, citing *Hamilton v. Abcon Constr.*, 12th Dist. Warren No. CA97-03-027, 1997 Ohio App. LEXIS 5235, *5 (Nov. 24, 1997).

- 12 -

{¶ 41} In the instant case, the trial court found Global Annex failed to demonstrate that the disputed property could have been rented as tillable farmland in 2017 or 2018. The court further found that Global Annex failed to establish that it was Jones' actions, rather than the actions of Global Annex's predecessors in interest, that created the non-tillable nature of the land. Having reviewed the record, we find competent and credible evidence supporting the trial court's decision. Although Dexter testified that the farmland abutting the disputed property rented for $250 an acre, there was evidence that the disputed property could not be used to farm as it was overgrown, contained trees, and was riddled with items of personal property. Furthermore, as Global Annex concedes in its appellate brief, there was testimony presented at trial that a portion of the disputed property was "wetter ground that was likely less fertile and less income producing."

{¶ 42} Accordingly, given the evidence presented at trial, we find no error in the trial court's denial of Global Annex's counterclaim for damages for loss of rental income. As the manifest weight of the evidence presented at trial demonstrated that the disputed property was not useable as farmland in 2017 and 2018, Global Annex's cross-assignment of error is overruled.

{¶ 43} Judgment affirmed.

RINGLAND and M. POWELL, JJ., concur.

- 13 -